Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 02 2014, 8:56 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**LAURA M. TAYLOR**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General

**ROBERT J. HENKE**
Deputy Attorney General

**CHRISTINA D. PACE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: R.L. (MINOR CHILD) | ) ) ) |
| | ) |
| AND | ) |
| | ) |
| T.L. (FATHER) | ) |
| | ) |
| Appellant-Respondent, | ) |
| | ) |
| vs. | ) No. 49A05-1402-JT-81 |
| | ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) |
| | ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE MARION COUNTY SUPERIOR COURT
The Honorable Marilyn Moores, Judge
The Honorable, Larry Bradley Magistrate
Cause No. 49D09-1307-JT-16107

**October 2, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

T.L. (Father) appeals the involuntary termination of his parental rights to R.L. (Child). Father challenge the sufficiency of the evidence supporting the juvenile court's judgment.

We affirm.

R.L. was born to fifteen-year-old J.S. (Mother)[1] in April 2008. Father, who was sixteen years old, was not aware of R.L.'s birth until four weeks later. Shortly after her birth, Child was removed and adjudicated a Child in Need of Services (CHINS). The CHINS case was closed when D.R. (Guardian) was granted a legal guardianship over Child. Shortly after the guardianship was entered, Father entered the military and left the state to go to basic training. Father returned to the Indianapolis area in 2009, but he did not obtain custody of Child. In December 2010, Father was discharged from the military for smoking marijuana. In December 2011, Father was convicted of class B felony attempted arson and class A misdemeanor possession of marijuana. Father received a suspended sentence and was placed on house arrest. Child remained in Guardian's care throughout this period.

On June 8, 2012, the Department of Child Services (DCS) filed a new petition alleging that Child was a CHINS. The petition alleged that Guardian was deceased and Child had no guardian available to meet her basic needs. The petition alleged further that Mother had not seen Child since 2009 and had not demonstrated an ability or willingness to parent Child, and that Father had recently been released from prison and lacked a

[1] The juvenile court also terminated Mother's parental rights, but Mother does not participate in this appeal. Accordingly, we discuss only the facts relevant to Father's appeal.

stable home for Child. Shortly after the CHINS case was filed, Father violated the terms of his house arrest by cutting off his electronic monitor. He was arrested on July 6, 2012, and went to prison for 336 days. Child was ultimately adjudicated a CHINS as to both Mother and Father and wardship was granted to the DCS. Child was placed with Guardian's adult daughter, F.R. (Foster Mother). Father was ordered to contact the DCS upon his release from incarceration.

The juvenile court held a review hearing on October 2, 2012, at which it noted that Father's services had been closed out due to his incarceration. A permanency hearing was held on July 16, 2013, at which Father appeared with counsel. At the hearing, the juvenile court changed the permanency plan to adoption, but ordered Father to participate in random drug screens and home-based services. The juvenile court also authorized Father to have parenting time with Child.

The DCS filed a petition to terminate Mother's and Father's parental rights on July 23, 2013. An evidentiary hearing was held on January 21, 2014. At the hearing, Father testified that he had moved in with his aunt three weeks before the hearing and that the home was safe and appropriate for Child. He testified further that upon his release from prison, he had gotten a job with a cleaning service owned by another aunt. Family Case Manager (FCM) Shantel Badji testified that she referred Father for random drug screens, home-based services, and visitation. FCM Badji testified further that Father did not complete random drug screens or home-based services and that he had not been visiting Child. FCM Badji also testified that Father had not maintained contact with her or called to check on Child, and that in the fall of 2013, Father had indicated that he wished to sign

3

a consent to Child's adoption. Father explained that he had stopped participating in random drug screens because "it seemed like too much of a hassle" and that he had not visited Child because he felt he needed "to focus on [him]self", but that he was now ready to "get back into the situation[.]" *Transcript* at 36, 32. At the time of the termination hearing, Father had not seen Child for three months.

At the conclusion of the termination hearing, the juvenile court took the matter under advisement. On January 27, 2014, the juvenile court issued its order terminating Mother's and Father's parental rights to Child. Father now appeals.

The juvenile court made detailed findings in its order terminating Father's parental rights to Child. Where the juvenile court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the juvenile court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen*, 671 N.E.2d 98.

We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the

4

termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144 (Ind. Ct. App. 2008). In addition, a juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

> (B)    that one (1) of the following is true:
>
>> (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services.

Ind. Code Ann. § 31-35-2-4(b)(2)(B) (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly). The State is also required to prove that termination of parental rights is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D). The State's burden of proof in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code Ann. § 31-37-14-2 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular

5

Technical Session of the 118th General Assembly)).  If the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship.  I.C. § 31-35-2-8 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly).

Father first challenges juvenile court's findings as to subsection (b)(2)(B) of the termination statute cited above.  We note DCS needed to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the juvenile court could terminate parental rights.  *See In re L.V.N.*, 799 N.E.2d 63 (Ind. Ct. App. 2003).  Here, the juvenile court found DCS presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in Child's removal or continued placement outside Father's care will not be remedied and that the continuation of the parent-child relationship poses a threat to Child's well-being.  *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii).  We focus our inquiry on the requirements of subsection (b)(2)(B)(i)—that is, whether there was sufficient evidence to establish a reasonable probability that the conditions resulting in Child's removal or continued placement outside Father's care will not be remedied.[2]

In making such a determination, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions.  *In re J.T.*, 742 N.E.2d 509 (Ind. Ct. App. 2001), *trans.*

---

[2] Accordingly, we need not address Father's argument with respect to the juvenile court's finding that there was a reasonable probability that continuation of the parent-child relationship poses a threat to Child's well-being.

*denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* In making this determination, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244 (Ind. Ct. App. 2002), *trans. denied*. The juvenile court may also consider the parent's response to the services offered through the DCS. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366 (Ind. Ct. App. 2007), *trans. denied*. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Id.* at 372 (quoting *In re L.S.*, 717 N.E.2d 204, 2010, (Ind. Ct. App. 1999), *trans. denied*). Moreover, the failure to exercise visitation demonstrates "a lack of commitment to complete the actions necessary to preserve [the] parent-child relationship." *Id.* (quoting *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002)) (alteration in original).

On appeal, Father argues that the conditions resulting in Child's removal or continued placement outside the home have been remedied. In support of this assertion, Father claims that at the time of the termination hearing, he was no longer incarcerated, had obtained suitable housing, and held a steady job for over eighteen months. With respect to Father's housing situation, we note that the juvenile court's finding that Father "has a history of unstable housing" is well supported by the evidence. *Appellant's Appendix* at 15. The evidence presented at the termination hearing indicates that Father

7

spent approximately one year of the eighteen months between the opening of the CHINS case and the termination hearing incarcerated. During the time he was not incarcerated, the evidence indicates that he lived in a homeless shelter, with a cousin, with his sister, and that he briefly rented a room in a larger home on a week-to-week basis. At the termination hearing, Father testified that he had been living with his aunt for just three weeks. Because Father did not provide FCM Badji with his new address, she had not been able to see the house or confirm that it was safe and appropriate for Child. In light of Father's history, it was well within the juvenile court's discretion to conclude that Father's housing instability had not been remedied.

We also note that the evidence does not support Father's assertion that he held a steady job for eighteen months. At the termination hearing, Father testified that he had worked for his aunt's cleaning service "off and on" for two or three years. *Transcript* at 29. We also note that Father was released from prison approximately six months before the termination hearing. It is therefore apparent that he did not hold a steady job for the eighteen months preceding the termination hearing. Although we acknowledge that Father was no longer incarcerated and apparently employed at the time of the termination hearing, the evidence presented at the termination hearing also established that Father failed to complete services. Father did not complete home-based services and he stopped participating in random drug screens because doing so "seemed like too much of a hassle[.]" *Id.* at 36. He also failed to visit Child and at the time of the hearing, had not seen her for three months. Moreover, just a few months before the termination hearing, Father had expressed a desire to consent to Child's adoption. For all of these reasons, we

8

conclude that the juvenile court's finding that the conditions that led to Child's removal and continued placement outside Father's care would not be remedied is supported by clear and convincing evidence.

Father also argues that the juvenile court's conclusion that termination was in Child's best interest was unsupported by the evidence. In determining whether termination of parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by the DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 2778 (Ind. Ct. App. 2013). In so doing, the juvenile court must subordinate the interest of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185 (Ind. Ct. App. 2003). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010).

In this case, Father has never had custody of Child or provided significant support. Guardian had custody of Child from her infancy until 2012, when Guardian passed away. Thereafter, Child was placed with Foster Mother, who is Guardian's daughter and has

always been a part of Child's life. Foster Mother and Child have been observed to have a bonded relationship, and Foster Mother wishes to adopt Child. Child's guardian ad litem testified that he believed termination of Father's parental rights was in Child's best interests because she needs permanency and consistency, which Foster Mother is willing and able to provide. Likewise, Child's home-based therapist testified that Child needs stability and that it is in her best interests to remain with Foster Mother. This evidence is sufficient to support the juvenile court's finding that termination of the parent-child relationship is in Child's best interests.

This court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Judgment affirmed.

VAIDIK, C.J., and MAY, J., concur.